**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

| | |
|---|---|
| CITY OF JACKSONVILLE, FLORIDA and JEA, <br><br> Plaintiffs, <br><br> v. <br><br> MUNICIPAL ELECTRIC AUTHORITY OF GEORGIA, <br><br> Defendant. | Case No.: 3:18-cv-01174-BJD-JRK |

**DECLARATION OF NEIL WOLK IN SUPPORT OF DEFENDANT'S
OPPOSITION TO JEA'S MOTION TO DISQUALIFY ORRICK**

NEIL WOLK declares the following to be true:

1. I am a Partner at the law firm of Orrick, Herrington & Sutcliffe LLP ("Orrick"), which represents Defendant Municipal Electric Authority of Georgia ("MEAG") in this action. I submit this Declaration in support of MEAG's Opposition to JEA's Motion to Disqualify Orrick as Counsel for MEAG. The statements made herein are based on my personal knowledge, as well as my review of relevant documents.

   **A.   Background**

2. I have been practicing law since 1984, principally in the field of public finance. In particular, I have spent the bulk of my legal career working on financing transactions for public power entities and rural electric cooperatives, including, among other things, public offerings, private placements, system and project financings, tax-exempt and taxable financings, and secured and unsecured debt. I have served in many roles throughout my career, including as bond counsel, underwriter's counsel, and counsel to credit enhancers. In addition, I have

considerable experience with various disclosure issues encountered by electric utilities.

      **B.**    **Orrick's Continuous Representation of MEAG**

    3.    Orrick has represented MEAG since 2000. In particular, beginning in March 2005 and continuing through the present day, Orrick has continuously represented MEAG in connection with the Alvin W. Vogtle Electric Generating Plant ("Plant Vogtle") and the development and construction of two additional nuclear generating units at Plant Vogtle (the "Project"), known as Units 3 and 4. Starting in 2007, on behalf of MEAG, Orrick negotiated the Power Purchase Agreement between MEAG and JEA (the "PPA") and, in connection with JEA's response to MEAG's solicitation of offers for the purchase of the output of the Project, represented MEAG in the execution of the PPA. I have been one of the lead attorneys for Orrick throughout its representation of MEAG.

        i.    Orrick's Representation of MEAG During Negotiations of the PPA

    4.    From March 2005 to April 2006, Orrick assisted MEAG in negotiating agreements with the other owners of Plant Vogtle to explore the potential development and construction of the Project.

    5.    From approximately October 2007 through May 2008, Orrick assisted MEAG in preparing materials for the solicitation of bids from prospective purchasers of power from Units 3 and 4 (including JEA), including drafting forms of offtake agreements with such purchasers.

    6.    Upon receiving acceptable bids from JEA and one other entity, MEAG entered into the original PPA in May 2008.

    7.    Orrick did not represent JEA in connection with the drafting and negotiation of the original PPA. Instead, JEA was represented during these negotiations by the Office of General Counsel of the City of Jacksonville, Florida ("OGC") and William R. Hollaway, who

was then a partner at the law firm of Pillsbury Winthrop Shaw Pittman LLP.  The negotiations of the original PPA between MEAG and JEA were adversarial, arm's-length negotiations.

8. Orrick made clear to JEA—and indeed JEA was fully aware at the time—that Orrick was representing MEAG during the negotiations of the original PPA.  This included, among other things, the exchange of numerous rounds of edits by counsel for JEA (Mr. Hollaway) and for MEAG (Orrick and Alston & Bird LLP), expressly on behalf of their respective clients.  JEA never objected to Orrick's representation of MEAG during these negotiations.

9. The original PPA was executed by JEA in April 2008 (which included approval as to form by Debra A. Braga of OGC) and by MEAG in May 2008.  It prominently listed Orrick and Alston & Bird as counsel for MEAG, and listed OGC and Mr. Hollaway as counsel for JEA.  *See* Exhibit 1, Original PPA at Exhibit D.

10. The original PPA contained extensive representations and warranties from JEA regarding its authority to enter into, and the binding nature of, the PPA, including the following:

- [JEA] has the power and authority to enter into and perform this Agreement and is not prohibited from entering into this Agreement or discharging and performing all covenants and obligations on its part to be performed under and pursuant to this Agreement.

- The execution, delivery and performance of this Agreement by [JEA] have been duly authorized by all necessary corporate action on the part of [JEA] and do not and will not require the consent of any trustee or holder of any indebtedness or other obligation of [JEA] or any other party to any other agreement with [JEA].

- No authorization, approval, order, license, permit, franchise or consent, and no registration, declaration or filing with any Governmental Authority is required on the part of [JEA] in connection with the execution, delivery and performance of this Agreement except those which [JEA] anticipates will be timely obtained in the ordinary course of performance of this Agreement.

- The execution and delivery of this Agreement, consummation of the transactions contemplated herein, and fulfillment of and compliance by [JEA] with the provisions of this Agreement will not conflict with or constitute a breach of or a default under any Applicable Law presently in effect having applicability to [JEA], the documents of formation of [JEA] or any outstanding trust indenture, deed of trust, mortgage, loan agreement or other evidence of indebtedness or any other agreement or instrument to which [JEA] is a party or by which any of its property is bound.

- This Agreement has been duly executed and delivered by [JEA]. This Agreement is a legal, valid and binding obligation of [JEA] enforceable in accordance with its terms, except as limited by laws of general applicability limiting the enforcement of creditors' rights or by the exercise of judicial discretion in accordance with general principles of equity.

*See* Exhibit 1, at § 702.

11. Orrick never advised JEA with respect to these, or any of JEA's other, representations and warranties in the original PPA.

      ii.    <u>Orrick's Representation of MEAG During the Financing of the Project</u>

12. After the execution of the original PPA, Orrick continued to represent MEAG during the financing of the Project. For example, Orrick was bond counsel to MEAG in all of the Plant Vogtle bond financings undertaken between April 2009 and September 2015. In addition, beginning in June 2010, Orrick has represented MEAG with respect to obtaining loans guaranteed by the U.S. Department of Energy, which are a further source of financing for the Project.

13. JEA was fully aware of Orrick's representation of MEAG throughout the financing of the Project. Indeed, Orrick is prominently identified as MEAG's counsel in numerous documents relating to such financings, including, for example, the offering documents for the bond financings. *See*, *e.g.*, Exhibit 2 (a true and correct copy of the Official Statement, Plant Vogtle Units 3 & 4 Project J Bonds, Taxable Series 2010A (Issuer Subsidy – Build

America Bonds) and Series 2010B (Tax-Exempt)) at Cover Page, ii, 77.  In turn, these offering documents list JEA as being represented by other counsel, including OGC as well as the law firm of Rogers Towers, P.A.  Id.

14.     JEA never objected to Orrick's representation of MEAG during the financing of the Project.  Just as before, JEA's counsel, including Rogers Towers, OGC, and Mr. Hollaway, exchanged comments on relevant documents with Orrick, each on behalf of their respective clients.

           iii.     Orrick's Representation of MEAG During Negotiations of Subsequent Amendments to and an Amendment and Restatement of the PPA

15.     MEAG and JEA executed amendments to the PPA in April 2009 and January 2010.  In December 2014, the parties executed an Amended and Restated PPA.

16.     The April 2009 and January 2010 amendments to the original PPA, as well as the December 2014 amendment and restatement of the PPA, primarily concerned matters relating to the financing of the Project.  Accordingly, Orrick represented MEAG during its negotiations with JEA regarding these amendments and the Amended and Restated PPA.  Orrick made clear to JEA—and indeed JEA was fully aware at the time—that Orrick was representing MEAG during these negotiations, including by, among other things, Orrick forwarding to JEA and to JEA's counsel MEAG's revisions to documents, expressly on behalf of MEAG.  JEA never objected to Orrick's representation of MEAG during these negotiations.

17.     Orrick did not represent JEA during negotiations of the aforementioned amendments to the PPA, nor during negotiations of the Amended and Restated PPA.  Instead, JEA was represented during such negotiations by OGC and Mr. Hollaway, who had since moved to the law firm Gibson, Dunn & Crutcher LLP.  The negotiations of the amendments, and of the Amended and Restated PPA, between MEAG and JEA were adversarial, arm's-length

5

negotiations.

18.     The Amended and Restated PPA contains the exact same representations and warranties from JEA regarding its authority to enter into, and the binding nature of, the Amended and Restated PPA as in the original PPA, as set forth above in Paragraph 10.  Orrick never advised JEA with respect to these, or any of JEA's other, representations and warranties in the Amended and Restated PPA.

19.     Orrick and Alston & Bird are prominently listed as MEAG's counsel in the Amended and Restated PPA.  JEA is listed as being represented by OGC and Mr. Hollaway of Gibson, Dunn & Crutcher LLP.  *See* Amended and Restated PPA at Exhibit D.

      **C.**     **Orrick's Prior Work for JEA**

20.     Orrick previously performed work for JEA on a variety of matters, including bond issuances, derivatives transactions, and other miscellaneous matters, none of which was related in any way to Plant Vogtle or the negotiation and execution of the PPA and its amendments and restatement, nor the financing of the Project.  The work Orrick performed for JEA concluded in July 2011, after which time Orrick has not performed any additional work for JEA.

21.     With the exception of 7.3 hours' worth of work, which is described in further detail below, none of the matters that Orrick ever worked on for JEA was related at all to Plant Vogtle or the PPA.

22.     Between 2008 and 2011, because of my knowledge of the PPA and the Plant Vogtle project (based on my work representing MEAG), I responded from time to time to specific questions raised by JEA and its in-house and outside lawyers with regard to PPA- and Project-related public disclosures that JEA was preparing to make.  My role in performing this work was limited to reviewing the factual accuracy of relevant portions of draft public

disclosures that had been prepared by individuals outside of Orrick. I spent a total of 4.25 hours working on such matters during this nearly three-year period.

23. On November 7, 2008, approximately six months after JEA executed the original PPA, I spoke on the telephone with Debra A. Braga of OGC. During that telephone conversation, which lasted less than twenty minutes, Ms. Braga asked if I would review a Petition and Complaint in a bond validation proceeding relating to the Project and the original PPA, as well as JEA's draft Answer to the Petition and Complaint.

24. Ms. Braga never requested that I conduct a legal analysis of the underlying admissions made in JEA's draft Answer, including its admissions that it was duly authorized to enter into the original PPA nor as to the binding nature thereof with respect to JEA. Instead, I understood her to be requesting that I review and double-check the form and factual accuracy of JEA's draft Answer to the Petition and Complaint. Indeed, the Answer had been drafted for JEA by Alston & Bird, which, alongside Orrick, and as referenced above, served as MEAG's counsel in connection with Plant Vogtle and the original PPA.

25. Ms. Braga could not have reasonably believed that my review of JEA's draft Answer included a legal analysis of whether JEA was authorized to enter into the original PPA, nor as to the binding nature thereof with respect to JEA. For one thing, she did not request that I perform this task. In addition, in the original PPA, which was executed by JEA six months earlier, JEA already had made representations and warranties regarding its legal authority to enter into the original PPA and as to the binding nature thereof with respect to JEA. *See supra* ¶ 10. Furthermore, Ms. Braga never transmitted to me any materials that would have been required for a legal analysis of JEA's authority to enter into the original PPA, such as resolutions of JEA's Board of Directors authorizing JEA's execution of the original PPA. In fact, I was

never given any confidential or non-public information in connection with my review of JEA's draft Answer.

26. Rather, in light of JEA's commitment of issues concerning JEA's authority to its counsel at OGC, OGC issued a series of opinion letters attesting to JEA's authority to execute the PPA, and the binding nature of the PPA, as part of various financing transactions between April 2009 and September 2015. True and correct copies of these opinion letters are attached Exhibit 3 (Opinion Letter of OGC dated April 29, 2009); Exhibit 4 (Opinion Letter of OGC dated March 11, 2010); Exhibit 5 (Opinion Letter of OGC dated June 24, 2015); and Exhibit 6 (Opinion Letter of OGC dated September 9, 2015). As noted, the parties' respective counsel and their roles were similarly identified and described in subsequent bond offering documentation. *See* Exhibit 2 at Cover Page, ii, 77.

27. I spent a total of 2.75 hours reviewing the draft Answer over a period of two days: November 12 and 13, 2008. I did not propose any edits or suggest any changes to Alston & Bird's draft but, instead, merely confirmed that I did not have any concerns regarding its form or factual accuracy. As part of that review, I confirmed the form of the bond validation pleading, cross-checked each of the 90 paragraphs cited in the Answer against the Petition and Complaint, and confirmed the statements made in each of those 90 paragraphs in the Petition and Complaint against the statements made in the underlying contractual and transaction documents.

28. On or about November 18, 2008, JEA filed the Answer as Alston & Bird had drafted it. As ultimately filed, JEA's Answer was four pages long. Only one of the four pages contained substantive admissions from JEA; the other three pages were solely procedural, as they contained, respectively, the caption for the proceeding, the signature block for JEA's counsel (Ms. Braga), and an acknowledgement of service of, among other things, the Petition and

Complaint.

29. I am not in possession of, nor have I ever obtained, any confidential or non-public information from JEA that relates in any way to the PPA, Plant Vogtle, or this litigation.

30. On September 15, 2017, Mr. Hollaway, as counsel to JEA, sent a letter to MEAG, copying Mr. Lyon at Orrick, stating that the letter should be considered "a formal litigation Preservation Notice . . . relating to JEA, the PPA, or to Plant Vogtle." A true and correct copy of that letter is attached as Exhibit 7.

31. On September 29, 2017, J. Allen Maines of Holland & Knight LLP (on behalf of JEA) again wrote MEAG, asserting that JEA's Plant Vogtle obligations had been "discharged" by "unforeseen" events, and seeking to end JEA's involvement. Counsel/JEA again copied Mr. Lyon at Orrick on this correspondence. A true and correct copy of that letter is attached as Exhibit 8.

32. On February 23, 2018, MEAG responded by letter to JEA, insisting that JEA provide MEAG with adequate assurances of JEA's performance of the PPA, pursuant to the Georgia Uniform Commercial Code, or UCC. A true and correct copy of that letter is attached as Exhibit 9.

33. On March 9, 2018, Mr. Maines (on behalf of JEA) wrote MEAG, disputing the assertions of MEAG's February 23, 2018 letter. Counsel/JEA again copied Mr. Lyon at Orrick on this correspondence. A true and correct copy of that letter is attached as Exhibit 10.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of November, 2018.

_____
NEIL WOLK